## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                                        **No. 17-201**

**CURTIS JOHNSON, JR.**                                **SECTION I**

## ORDER AND REASONS

Before the Court are two motions filed by defendant Curtis Johnson, Jr. ("Johnson"). The first is Johnson's motion[1] to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, raising nine grounds of constitutionally ineffective assistance of counsel. The government filed a memorandum[2] in opposition to the motion.

The second motion is Johnson's motion[3] for a new trial, which alleges that the government suppressed material impeachment evidence pertaining to two of the government's cooperating witnesses in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Johnson's motion for a new trial alternatively raises the same grounds raised in his § 2255 motion and includes a more thorough discussion in support of those arguments.[4] The government likewise opposes this motion.[5] Johnson filed a reply addressing both oppositions.[6]

For the reasons set forth below, the Court denies both of Johnson's motions.

---

[1] R. Doc. No. 1837.
[2] R. Doc. No. 1845.
[3] R. Doc. No. 1836.
[4] *See* R. Doc. No. 1843, at 8–9, 28–64.
[5] R. Doc. No. 1848.
[6] R. Doc. No. 1851.

# I.    BACKGROUND

This case arises out of an armed robbery of a Loomis armored truck that occurred on December 18, 2013 at a Chase Bank branch in New Orleans, Louisiana.[7] Hector Trochez ("Trochez"), a Loomis security guard, was shot and killed during the course of the robbery.[8] Count one of the second superseding indictment charged Johnson with conspiracy to obstruct commerce by robbery pursuant to 18 U.S.C. § 1951(a).[9] Count two charged Johnson with obstruction of commerce by robbery pursuant to the same.[10] Count three charged Johnson with using, carrying, brandishing, and discharging firearms during and in relation to a crime of violence, causing death, pursuant to §§ 924(c)(1)(A) and 924(j)(1).[11]

Johnson's first trial, in July 2021, ended in a mistrial after the jury could not reach a verdict.[12] Johnson's retrial began on March 28, 2022.[13] After his retrial, the jury returned its verdict, finding Johnson guilty on all counts.[14] Johnson was thereby sentenced to a term of imprisonment of 120 months as to each of counts 1 and 2, and 600 months as to count 3, which terms were to be served concurrently.[15]

---

[7] R. Doc. No. 237, at 2.
[8] *Id.* at 3.
[9] *Id.* at 1–2.
[10] *Id.* at 2–3.
[11] *Id.* at 3.
[12] R. Doc. No. 1450.
[13] R. Doc. No. 1657.
[14] R. Doc. No. 1668.
[15] R. Doc. No. 1733, at 2.

Johnson appealed his convictions and sentence on July 13, 2022.[16] He raised two arguments in support of his appeal: first, that the prosecutor had erroneously conflated two probabilities and suggested, incorrectly, that there was "1 in 4,100 chance that" the DNA from a bandana found in the Tahoe was "not him;"[17] and, second, that this Court had erroneously admitted the statement of one of his co-defendants through the testimony of a government witness, Jamell Hurst ("Hurst"), because the statement did not fit within Federal Rule of Evidence 804(b)(3)'s hearsay exception for statements against interest by unavailable witnesses.[18] The Fifth Circuit affirmed his conviction on November 17, 2023, finding that Johnson could not show that his substantial rights were affected as a result of either alleged error.[19]

Separately, in April 2022, two of Johnson's co-defendants—Robert Brumfield, III ("Brumfield") and Jeremy Esteves ("Esteves")—appealed this Court's denial[20] of their motion for a new trial.[21] Their motion[22] for a new trial alleged that the government had suppressed material impeachment evidence in violation of *Brady v. Maryland*[23] and *Giglio v. United States*.[24] The Fifth Circuit affirmed in part, reversed in part, and remanded the case to this Court with respect to Esteves so that this Court

---

[16] *See* R. Doc. No. 1735.
[17] *See* R. Doc. No. 1776, at 3.
[18] *See id.* at 6.
[19] *See generally id.*
[20] R. Doc. No. 1624.
[21] *See* R. Doc. Nos. 1690, 1695.
[22] R. Doc. No. 1587.
[23] 373 U.S. 83 (1963*).*
[24] 405 U.S. 150 (1972).

could decide whether the government had "suppressed' the evidence within the meaning of *Brady*.[25] On remand, this Court found that the government did not suppress the relevant evidence within the meaning of *Brady*, and it again denied Esteves's request for a new trial.[26] Esteves appealed the Court's second denial of his motion.[27] On August 1, 2025, the Fifth Circuit affirmed this Court's denial, agreeing that the evidence was not suppressed pursuant to *Brady*.[28]

In Johnson's present motion for a new trial, he argues that he is entitled to a new trial because the government violated *Brady v. Maryland* and *Giglio v. United States* by suppressing the same impeachment evidence at issue in Brumfield and Esteves's motion for a new trial.[29] With respect to his § 2255 motion, Johnson provides

---

[25] *See* R. Doc. No. 1779.

[26] R. Doc. No. 1819, at 10.

[27] *See* R. Doc. No. 1820.

[28] *See* R. Doc. No. 1852.

[29] R. Doc. No. 1843, at 11. The Court notes that Johnson styles his motion for new trial as pursuant to both Federal Rule of Criminal Procedure 33 and *Brady*. Rule 33 permits the court to grant a new trial, upon motion by the defendant, "if the interests of justice so require." Courts generally apply the *Berry* rule to motions for new trial based on newly-discovered evidence, brought pursuant to Rule 33. *See, e.g.*, *United States v. Turner*, 674 F.3d 420, 428–29 (5th Cir. 2012); *see also Berry v. Georgia*, 10 Ga. 511 (1851). "However, when a motion for new trial based on newly-discovered evidence raises a *Brady* claim, [the court] applies the three-prong *Brady* test to determine whether a new trial is appropriate." *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002); *see also Turner*, 674 F.3d at 428–29 (separately addressing claims pursuant to *Brady* and Rule 33, and applying the *Brady* test to the former and *Berry* to the latter); *United States v. Mokwuah*, No. 16-254-1, 2019 WL 1407266, at *2 (S.D. Tex. Mar. 28, 2019) ("*Brady* is a separate basis for granting a new trial, independent of Rule 33."); Wright & Miller, 3 Fed. Prac. & Proc. Crim. § 586 (4th ed.) ("Courts do not resolve motions for a new trial based on a claim that the government failed to disclose material falling within *Brady* by using the *Berry* rule.").

The *Brady* standard differs from the *Berry* rule in several significant respects. Under *Berry*, defendants must show "(1) the evidence is newly discovered and was unknown

4

nine grounds by which he alleges that his counsel provided constitutionally ineffective assistance.[30]

## II.      STANDARDS OF LAW

### a. Brady Standard for New Trial

"Under *Brady* and its progeny, due process requires that the prosecution disclose evidence that is both favorable to the defendant and material to guilt or punishment." *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018) (citing *Brady*, 373 U.S. at 87). "This duty to disclose exists irrespective of a request from the defense and extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'" *Id.* at 161–62 (internal citation omitted) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). "*Giglio* applies *Brady* to evidence affecting the credibility of key government witnesses." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016) (citation omitted).

To obtain a new trial pursuant to *Brady* and its progeny, defendants must demonstrate that "(1) evidence was suppressed; (2) the suppressed evidence was

---

to the defendant at the time of trial; (2) the failure to detect the evidence was not due to the defendant's lack of diligence; (3) *the evidence is not merely cumulative or impeaching*; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal." *United States v. Piazza*, 647 F.3d 559, 565 & n.4 (5th Cir. 2011) (emphasis added). Thus, for instance, *Brady* and *Berry* differ because impeachment evidence may form a basis for a new trial under the former but not the latter. *See, e.g.*, *United States v. Wall*, 389 F.3d 457, 470 (5th Cir. 2004) (collecting cases). Accordingly, to the extent that Johnson raises an argument for a new trial pursuant to Rule 33 and *Berry*, such an argument fails because, among other things, he has only accused the government of withholding impeachment evidence.

[30] R. Doc. No. 1837, at 12.

favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002).

"Evidence is not 'suppressed' if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it . . . . The government is not required, in other words, to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own.'" *Runyan*, 290 F.3d at 246 (alteration in original) (quoting *United States v. Shoher*, 555 F. Supp. 346, 352 (S.D.N.Y. 1983)); *see also United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) (explaining that "[w]hen information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no *Brady* claim") (internal quotation marks and citation omitted). As to the second prong, "evidence impeaching a prosecution witness is favorable *Brady* evidence." *Floyd*, 894 F.3d at 163 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

Finally, with respect to the third prong, evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Brumfield*, 89 F.4th 506, 513–14 (5th Cir. 2023) (quoting *Bagley*, 473 U.S. at 682). "A reasonable probability is established when the failure to disclose the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 514 (quoting *Runyan*, 290 F.3d at 247) (cleaned up).

The materiality of suppressed evidence is "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

### b.  28 U.S.C. § 2255

Title 28, United States Code, section 2255 allows a federal inmate to move to vacate, set aside or correct his sentence on the ground that it was "imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief pursuant to § 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam).

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate 'cause' and 'actual prejudice,' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted). "This cause and actual prejudice standard presents 'a significantly higher hurdle' than the 'plain error' standard [applied] on direct appeal." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc) (quoting *United States v. Frady*, 456 U.S. 152, 166 (1982)).

To establish cause, the defendant must show that "'some objective factor external to the defense' prevented him from raising on direct appeal the claim he now advances." *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996) (quoting *Romero*

7

*v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992)). "Objective factors that constitute cause include interference by officials that makes compliance with the procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel at the prior occasion, and ineffective assistance of counsel in the constitutional sense." *Id.* To satisfy the actual prejudice requirement, the defendant must demonstrate that, "but for the error, he might not have been convicted." *Id.* at 994.

Johnson claims that he is entitled to relief pursuant to 28 U.S.C. § 2255 because the ineffective assistance of his trial counsel and appellate counsel deprived him of his rights under the Sixth Amendment. Ineffective assistance of counsel claims satisfy the cause and prejudice standards, and they are ordinarily first raised on collateral review due to the difficulty of compiling an adequate record by the time of direct appeal. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992). Furthermore, the Supreme Court has held that defendants may raise ineffective assistance of counsel for the first time on collateral review even if the defendant had possessed an adequate record by the time of direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2004). The *Massaro* court explained that a trial transcript is unlikely to show the existence of conflicts of interest or whether or not trial counsel's actions were supported by reasonable strategy. *Id.* at 505. The Court concluded that the "better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255." *Id.* at 504.

When considering a § 2255 motion, the court shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "A petitioner is entitled to an evidentiary hearing if he makes specific factual claims that are 'not speculative, conclusory, plainly false, or contradicted by the record.'" *United States v. White*, 840 F. App'x 798, 799 (5th Cir. 2021) (quoting *United States v. Reed*, 719 F.3d 369, 374 (5th Cir. 2013)).

### c.  Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a defendant must demonstrate both that his attorney's performance was deficient and that this substandard performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "If the petitioner fails to prove the prejudice component, the court need not address the question of counsel's performance." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009). "Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998). Indeed, it is the "defendant's burden to prove" prejudice, which he meets by demonstrating "a reasonable probability that the result would have been different." *Coleman v. Vannoy*, 963 F.3d 429, 434 (5th Cir. 2020).

To demonstrate deficiency of counsel for purposes of an ineffective assistance of counsel claim, counsel's errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466

U.S. at 687. A defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness. . . . under prevailing professional norms." *Id.* at 687–88. In conducting this inquiry, courts must consider reasonableness in light of all of the circumstances. *Id.* at 688. Courts must be highly deferential and seek to "eliminate the distorting effects of hindsight." *Id.* at 689. The defendant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that "the challenged conduct 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

In order to prove prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The court must consider the totality of the evidence that was before the judge or jury when considering whether the error had a reasonable probability of affecting the outcome. *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

"The entitlement to effective assistance does not end when the sentence is imposed, but extends to one's first appeal of right." *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). Appellate counsel's performance is evaluated under the

10

same *Strickland* standard as is trial counsel's performance. *Id.* With respect to the deficient performance prong in the appellate context, the Fifth Circuit has stated that "[c]ounsel does not need to 'raise every nonfrivolous ground of appeal available.'" *Id.* "Nonetheless, a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Id.* (quoting *Green*, 160 F.3d at 1043). As for the prejudice prong, defendant must first show that he would have been afforded relief on appeal. *United States v. Phillips*, 210 F.3d 345, 350 (5th Cir. 2000) ("[T]he prejudice prong first requires a showing that would have afforded relief on appeal.").

## III.    ANALYSIS

### a.  Motion for a New Trial

Johnson states that in October 2021, counsel for Johnson's co-defendant Chukwudi Ofomata ("Ofomata") disclosed evidence obtained during the investigation of Ofomata's case to counsel for co-defendants Esteves and Brumfield.[31] The evidence involved deals that the government had made with two of its cooperating witnesses, Jamell Hurst ("Hurst") and Lyndell Hinton.[32] Esteves and Brumfield moved for a new trial on November 24, 2021, arguing that the government had violated *Brady* and

---

[31] R. Doc. No. 1843, at 11.
[32] R. Doc. No. 1587-1, at 1–2.

*Giglio* by suppressing this evidence.[33] Johnson bases his motion on this same

evidence, with respect to Hurst.[34] These categories of evidence are as follows:[35]

1. Recordings of seven phone calls from Hurst to his mom while he was in jail, in which he asked his mom to call the FBI. Hurst said that FBI Special Agent Rayes told him that he could get his charges dismissed and that Rayes and AUSA McMahon told him they could get him out of anything but murder. Hurst's mom reported to Hurst that Special Agent Elmer was working with the district attorney to get him out.

2. New Orleans Police Department (NOPD) incident report regarding Hurst's 2013 aggravated burglary charge that states that the victim was "one hundred percent sure" that Hurst was the perpetrator. Hurst testified that the charges were dismissed because the witness mistakenly picked him in the photo lineup.

3. A Brazoria County, Texas, investigation report showing that Hurst (1) was arrested for possessing 37 stolen credit cards and controlled substances and (2) was later indicted for fraudulently possessing only two credit cards. At trial, Hurst testified only to the latter.

4. A Baton Rouge Police Department incident report regarding Hurst's 2014 arrest for battery, which stated that an officer discovered that Hurst had an outstanding warrant for burglary issued by the NOPD. The report states that the officer was initially advised that the NOPD wanted Hurst booked, but that the officer was then advised by the NOPD to release Hurst because he was an informant.

5. A Louisiana Department of Public Safety and Corrections file on Hurst, which states that Hurst had an active warrant issued by Texas and that "Texas indicated that they were coming to get [Hurst]." Another entry states that Special Agent Elmer called on the same date that the Texas arrest warrant was issued and asked to speak with Hurst's supervising probation officer. Another earlier entry notes that Special Agent Elmer called in October 2014 seeking

---

[33] *Id.*

[34] *See* R. Doc. No. 1843, at 11.

[35] *Id.*; see also *United States v. Brumfield*, 89 F.4th 506, 514 (5th Cir. 2023), *cert. denied*, 145 S. Ct. 244 (2024).

> Hurst's contact information and stating that he was trying to retrieve
> "some type of FBI issued equipment."

Like Esteves and Brumfield, Johnson argues that "Hurst was the only witness who implicated [him] in the crimes, so the above impeachment evidence was critical to attacking his credibility."[36] *Brumfield*, 89 F.4th at 514.

In the Court's first order and reasons addressing Brumsfield's and Esteves's motion with respect to this evidence, the Court denied the motion, finding that the evidence allegedly suppressed was not material in light of the trial record.[37] On appeal, the Fifth Circuit agreed that the evidence was not material as to Brumfield, but found that it was material as to Esteves. *See Brumfield*, 89 F.4th at 516–17 ("Although there is overwhelming evidence against Brumfield, who was convicted only of conspiracy, we cannot say the same for Esteves, who was convicted on all three charges."). On remand, this Court again denied the motion as to Esteves, concluding that the government did not suppress the relevant evidence within the meaning of *Brady*.[38] The Fifth Circuit affirmed this Court's second denial on appeal.[39]

Johnson argues that the evidence was suppressed because his counsel was never made aware of it—from either the government or Ofomata's counsel—before his trial. Regardless of whether this is true,[40] the evidence was not suppressed for

---

[36] R. Doc. No. 1843, at 31.

[37] R. Doc. No. 1624, at 27–28.

[38] R. Doc. No. 1819, at 10.

[39] *See* R. Doc. No. 1852.

[40] The government claims that "Johnson was provided with the items prior to his re-trial in May 2022. The government produced these items in discovery prior to trial." *See* R. Doc. No. 1848, at 4.

*Brady* purposes because it was discoverable with reasonable diligence. *Mathis v. Dretke*, 124 F. App'x 865, 876–77 (5th Cir. 2005).

Johnson's retrial did not begin until March 28, 2022, more than five months after Esteves and Brumfield made their motion for a new trial based on this same evidence. *See* R. Doc. No. 1587 (filed November 24, 2021); *see also* R. Doc. No. 1624 (the Court's order denying Esteves and Brumfield's motion for new trial, filed March 4, 2022). Accordingly, the evidence was not unavailable to Johnson's counsel because he either knew or should have known about it, such that he was enabled to take advantage of it for trial. *See Runyan*, 290 F.3d at 246; *see also Dennes v. Davis*, 797 F. App'x 835, 844 (5th Cir. 2020) (finding the exculpatory testimony produced in the separate trial of co-perpetrators was not suppressed within the meaning of *Brady* because it was "available . . . through the exercise of due diligence" to the defendant with "sufficient time for him to have used it" in his proceedings). The evidence was therefore not suppressed within the meaning of *Brady*, and Johnson is not entitled to a new trial based on this evidence.[41]

---

[41] Because the Court finds the evidence was not suppressed, it need not address Johnson's argument as to materiality. *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) ("Because the government did not suppress any information . . . we need not address its materiality."). Still, the Court is not convinced by Johnson's argument that the evidence is clearly material as to him because "if it was material as to Esteves, it was definitely material as to [him], against whom the evidence was much weaker than it had been against Esteves." R. Doc. No. 1843, at 21; *see also Brumfield*, 89 F.4th at 517 ("While some of Hurst's testimony was corroborated, we cannot say that it was strongly corroborated [as to Esteves]."). Unlike Esteves, ample evidence other than Hurst's testimony implicated Johnson in the robbery, such as the testimony of jailhouse informant Gerardo Tejeda, *see* R. Doc. No. 1754, at 195–232, and the evidence that the DNA located on a bandana found in the vehicle used in the

### b. Section 2255 Motion

Johnson raises nine grounds in support of his ineffective assistance of counsel claim.[42] The Court assesses each of Johnson's arguments in turn.

### i. Failure to Discover Evidence Allegedly Suppressed by the Government and Failure to Use that Evidence in Cross-Examination

As his first basis to vacate his sentence, Johnson alleges that his counsel was deficient because "he failed to discover the five categories of evidence that w[ere] allegedly suppressed by the Government" and because "he failed to utilize that evidence to effectively cross examine certain Government witnesses."[43] These are the same categories of evidence discussed above in relation to Johnson's motion for a new trial, and each category of evidence concerns Hurst.[44] Johnson argues that if no *Brady* violation is found as to this evidence, failure to be aware of the evidence or use it to cross examine Hurst constitutes deficient performance because "the majority of the Government's case against [Johnson] was based upon the largely uncorroborated testimony of . . . Hurst."[45] He contends that this evidence could have also been used to impeach the testimony of FBI Special Agents Elmer ("Elmer") and Steven Rayes ("Rayes") regarding their denials of helping Hurst.[46]

---

armed robbery could not exclude Johnson as a potential contributor, *see* R. Doc. No. 1753, at 243. It cannot be said that the issue of materiality with respect to this evidence was foreclosed by the Fifth Circuit when it decided the issue with respect to Esteves.

[42] R. Doc. No. 1837, at 12.

[43] *Id.*

[44] *See* R. Doc. No. 1843, at 28.

[45] *Id.* at 31.

[46] *Id.* at 32.

With respect to Johnson's argument that his counsel was deficient for failing to utilize this evidence during cross-examination of Hurst, the Court concludes that Johnson's counsel was not deficient in this regard. Johnson's counsel did confront Hurst with impeachment evidence on cross examination, specifically pointing out Hurst's credit card fraud conviction and attempted armed robbery, home invasion, and sexual assault charges.[47] His counsel also questioned Hurst about the lenient sentences he received with respect to those crimes,[48] and explicitly called Hurst's credibility into question by asking Hurst whether he expected this leniency in exchange for his role as an informant.[49]

"Because decisions regarding cross-examination are strategic, they usually will not support an ineffective assistance claim." *United States v. Valas*, 40 F.4th 253, 262–63 (5th Cir. 2022) (citation modified); *see also Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd sub nom. Ford v. Dretke*, 135 F. App'x 769 (5th Cir. 2005) ("The decision whether to cross-examine a witness, and if so, how vigorously to challenge that witness' testimony, requires a quintessential exercise of professional judgment."). The fact that Johnson's counsel may have declined to use every piece of possible evidence of Hurst's cooperation with the government on cross examination does not make his performance deficient, particularly considering the fact that that

---

[47] *See id.*

[48] *See id.*

[49] *See id.*

shortly before Johnson's retrial began, this Court had determined that this evidence was immaterial as to Johnson's co-defendants.[50]

To the extent that Johnson attempts to initiate an ineffective assistance of counsel claim on the ground that his counsel failed to adequately investigate, and therefore discover, the additional impeachment evidence, it must first be noted that the record does not definitively establish that Johnson's counsel did not monitor the docket or discover this evidence.[51] More importantly, Johnson cannot establish that any failure to find and utilize this evidence on cross examination prejudiced his case.

"The materiality standard under *Brady* . . . is identical to the prejudice standard under *Strickland*." *Guidry v. Lumpkin*, 2 F.4th 472, 492 (5th Cir. 2021); *see also Brumfield*, 89 F.4th at 513–14 (stating that evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result

---

[50] *See* R. Doc. No. 1624. Although, in hindsight, one might say that Johnson's counsel was deficient for not recognizing—as the Fifth Circuit determined in *Brumfield*—that the evidence *was* material as to Esteves, and therefore may be material with respect to Johnson, counsel's strategic choice to limit the impeachment evidence on cross cannot be said to be unreasonable at the time it was made. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

[51] The only "evidence" Johnson puts forth that his counsel failed to discover the Hurst evidence is an email he allegedly received from his counsel stating that "Ofomata's legal team did not disclose this evidence to [Johnson's] legal team." R. Doc. No. 1843, at 17; *see also id.* at 25 ("Mr. Gibbens maintains that he was not contacted by Chukwudi Obokata's legal team regarding the evidence they had uncovered and had disclosed to the Government and to the attorneys for Esteves and Brumfield …"). This does not demonstrate that his counsel did not become aware of the evidence through his own monitoring of the docket.

17

of the proceeding would have been different"); *Coleman*, 963 F.3d at 433 (stating that "[t]o prove prejudice . . . there must be a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (internal quotations omitted)). As the Court already mentioned with respect to Johnson's *Brady* argument,[52] this evidence is not material as to Johnson merely because the Fifth Circuit found that it was material as to Esteves. In *Brumfield*, the Fifth Circuit found the evidence was material with respect to Esteves because Hurst's testimony was not "strongly corroborated" by other evidence that supported Esteves's guilty verdict. *Brumfield*, 89 F.4th at 516–17.

In Esteves's trial, Hurst testified that Esteves had told him that his role in the robbery was as the driver of the Tahoe, and he also testified that Esteves had shown him a stack of money in a shoebox at Esteves's mother's house. *Id.* at 517. The other evidence tying Esteves to the robbery included Cedric Wade's ("Wade") testimony that Esteves was "part of 'the circle'" and that he had seen Esteves in the driver seat of the Tahoe on the morning of the robbery when the defendants had come to his house to pick up firearms. *See id.* at 517–18 ("But he allegedly saw Esteves through the Tahoe's windows that were so 'heavily tinted' that 'the normal person' would not have been able see through them."). Wade also testified that Esteves had told him that "he was concerned that Brumfield was snitching to the FBI about the robbery." *Id.* at 518. In addition, there was evidence that Thierry King, a Chase Bank employee that was

---

[52] *See supra* note 42.

a person of interest in the robbery, "had Esteves's number in her phone" and that he "was in her top ten most contacted numbers." *Id.* Lastly, a search of Esteves's mother's houses had "revealed $20,000, some of it in shoeboxes," like Hurst and Elmer had testified.[53] *Id.* However, as the Fifth Circuit pointed out, "Loomis does not tally money by serial number, so the only way for the Government to connect the money to the robbery is by the bills' denomination. And there was evidence suggesting that the money may have been from Esteves's employer, who paid him exclusively in cash." *Id.* The Fifth Circuit held that "[a]lthough a close question, . . . Esteves has shown that the [Hurst] evidence is sufficient to undermine confidence in the verdict and is thus material." *Id.* (citation modified).

The question is not close for Johnson. Hurst's testimony with respect to Johnson served to implicate Johnson as a participant in the robbery, and specifically, as one of the shooters.[54] As the Fifth Circuit pointed out on Johnson's direct appeal, "there were various pieces of corroborating evidence" that placed Johnson as a shooter in the robbery. *See Johnson*, 85 F.4th at 321.

Like Wade's testimony at Esteves's trial, Wade testified at Johnson's trial that he saw Johnson in the Tahoe on the morning of the robbery.[55] Wade also testified to

---

[53] "Although the information about the money came from Hurst, Special Agent Elmer testified to a jail call he listened to between Esteves and his girlfriend at the time, in which Esteves told her that he had money in shoeboxes in his closet." *Brumfield*, 89 F.4th at 518.

[54] *See* R. Doc. No. 1753, at 130–186; *see also Johnson*, 85 F.4th at 320 (describing some of Hurst's statements implicating Johnson in the robbery and as a shooter).

[55] *See* R. Doc. No. 1753, at 274–76.

19

making eye contact with Johnson when Ofomata opened the back door of the Tahoe to set a bag of firearms inside, at which time he also saw Johnson "lean[] over to pull the duffle bag up to the middle of the truck."[56] In addition to Wade's testimony, there was testimony from Anjene Treaudo ("Treaudo"), the second security guard who witnessed the robbery from inside the armored car, that three individuals had exited the Tahoe, one shooting at the truck while the other two were shooting at Trochez.[57] This testimony was corroborated by video evidence shown to the jury.[58] Treaudo also testified that the shooters were wearing bandanas across their faces during the robbery.[59] And a bandana was recovered from the Tahoe that contained a partial DNA profile, of which Johnson could not be excluded as a potential contributor.[60]

Finally, a jailhouse informant, Gerardo Tejeda ("Tejeda"), testified that he had overheard a conversation between George and Johnson in which Johnson was frustrated with George because he had "told [George] to use gloves and [George] didn't want to use gloves and . . . [it caused the government] to get the fingerprints and the DNA off the screwdriver that was left in the truck they used, and then [George] told [Johnson] all you have to do is don't say nothing. Man, you're going to be okay."[61] Tejeda also testified that, while watching a movie in which the characters "use[d] the president face[] [masks] to rob armored trucks," Johnson told him, "to rob an armored

---

[56] *Id.* at 275–76.
[57] R. Doc. No. 1752, at 257–58.
[58] *See id.*
[59] R. Doc. No. 1752, at 260–61.
[60] *See* R. Doc. No. 1753, at 242–46.
[61] R. Doc. No. 1754, at 205.

truck is not that hard because all you got to do is have somebody in the inside and they give you the day on the drop, and then he said you got to wait for the men to come out and you got to rush them . . . ."[62] Because this evidence strongly corroborates Hurst's testimony tying Johnson to the robbery, the Hurst evidence is not material as to Johnson. *Brumfield*, 89 F.4th at 515 ("Nor is . . . evidence material when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict." (internal citations omitted)).

Consequently, Johnson fails to carry his ineffective assistance of counsel burden of demonstrating that there is "a reasonable probability that the result would have been different," but for his counsel's alleged failure to locate and utilize the Hurst evidence. *Coleman*, 963 F.3d at 434; *see also Strickland*, 466 U.S. at 694.

### ii.    Failure to Adequately Investigate and Prepare for Trial

Johnson's second argument states that his counsel failed to investigate and prepare for trial.[63] Specifically, Johnson points to four examples of counsel's "most egregious" failures to investigate: (1) his failure to investigate the window tinting; (2) his failure to familiarize himself with Wade's testimony at the trials of Esteves and Brumfield such that he could impeach Wade at Johnson's trial; (3) his failure to investigate and call as a witness an individual who could undermine the testimony of jailhouse informant Tejeda; and (4) his failure to investigate Johnson's alibi. In

---

[62] *Id.* at 201–02.
[63] R. Doc. No. 1837, at 12.

another section of his motion, Johnson also points to his counsel's failure to investigate whether there were peer-reviewed validation studies with respect to "probabilistic genotyping involving trace amounts of DNA and multiple contributors," as testified to by DNA analyst Jennifer Brocamontes ("Brocamontes").[64]

As to his first argument, Johnson states that his counsel "failed to conduct any type of investigation regarding the window tinting on the Chevy Tahoe that was allegedly used in the robbery."[65] Specifically, Johnson argues that his counsel failed to file a motion to conduct a reenactment of Wade's purported observation of the Tahoe such that the jurors could have seen that Wade could not have seen what he claims he saw.[66] According to Johnson, a reenactment would have shown "the jury that it would have been *impossible* for Wade to have identified any of the alleged occupants of the Chevy Tahoe under the circumstances in effect at the time."[67]

A petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). Johnson has not demonstrated that this investigation would have revealed what he claims, or that there is a reasonable probability it would have changed the outcome of the proceedings. Johnson claims that his "painstaking[] review" of Wade's testimony and photographic evidence of the Tahoe and Wade's residence revealed

---

[64] *See* R. Doc. No. 1843, at 51.
[65] *See id.* at 33.
[66] *Id.*
[67] R. Doc. No. 1851, at 7 (emphasis added).

22

that "it would have been physically impossible" for Wade to have identified him from his vantage point because the tinted windows were mostly rolled up.[68] But the jury heard and saw this same evidence at trial, and it disagreed.

Wade testified during Johnson's trial that he saw Johnson in the back passenger seat of a Chevy Tahoe parked outside of his residence on the morning of December 18, 2013.[69] He testified that the windows "were cracked down enough so where you could stick your hand out and, you know, pluck your cigarette or what not."[70] Wade also testified that he witnessed Ofomata open the back seat of the car on the driver's side,[71] and that he approached the vehicle on that same side, enabling him to see inside and make eye contact with Johnson.[72] Johnson has failed to demonstrate how recreating the scene would have revealed that Wade could not have seen Johnson when Ofomata opened the back car door.

Johnson has likewise failed to demonstrate any prejudice as a result of this failure. The jury heard Wade's testimony and saw photos of the Tahoe and Wade's residence. Johnson's counsel specifically challenged Wade on cross-examination with respect to his ability to see Johnson in the Tahoe.[73] While a live demonstration *may* have revealed more than the evidence at trial did,[74] Johnson cannot show that the

---

[68] *Id.* at 33; *see also* R. Doc. No. 1851, at 8.

[69] R. Doc. No. 1753, 273–75.

[70] *Id.* at 274.

[71] *Id.* at 273–74.

[72] *Id.* at 273, 275.

[73] *See id.* at 330.

[74] Again, Johnson has not demonstrated that a live demonstration would have revealed that Wade's identification of Johnson in the car would have been physically

jury would have reached a different conclusion than the one they reached based on this evidence.

Johnson's second argument also pertains to Wade's testimony. Johnson argues that his counsel failed to familiarize himself with Wade's testimony so that he could impeach Wade with inconsistencies.[75] Johnson gives an example of an inconsistency, alleging that Wade testified at Esteves's and Brumfield's trial that Ofomata "threw the duffel bag" into the car, but at Johnson's trial he testified that Ofomata opened the door and sat the duffel bag in there.[76] He also states that at Johnson's trial, Wade testified that he saw Johnson pull the duffel bag up towards the middle of the truck, but that Wade had never included this detail in prior testimony.[77] Johnson asks the Court to "[i]magine the impact on the jury" had his counsel mentioned these "glaring" omissions and inconsistencies during cross examination.[78]

"Speculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against." *Castillo v. Stephens*,

---

impossible. Even so, "the Sixth Amendment entitles a criminal defendant to reasonable, but not perfect, representation of counsel." *United States v. Valdez*, 973 F.3d 396, 404 (5th Cir. 2020). Johnson's counsel's strategy to undermine Wade's testimony by painting the picture that Wade was lying about what he saw to cover the fact that he was involved in the robbery cannot be said to be unreasonable, even if Johnson thinks another strategy would have been better. *See* R. Doc. No. 1753, at 329 ("Q. Mr. Wade, you never saw Curtis sitting in that truck, did you? A. I did. Q. You made that up to throw the FBI off your trail? A. No, I didn't."). *See Nelson v. Davis*, 952 F.3d 651, 674 (5th Cir. 2020) ("The reasonableness of pretrial investigation should be considered in light of the chosen trial strategy.").

[75] *Id.* at 33–34.

[76] *Id.*

[77] *Id.* at 34.

[78] R. Doc. No. 1851, at 10.

640 F. App'x 283, 292 (5th Cir. 2016). Furthermore, the Court cannot conclude that had Johnson's counsel cross-examined Wade about whether Ofomata threw the duffel bag into the car or sat it in the car, it would have had a reasonable probability of changing the outcome of the proceedings. Nor would cross examination regarding the absence of factual details about Johnson pulling the duffle bag into the Tahoe in previous testimony have had a reasonable likelihood of changing the outcome, especially considering that Wade testified to making eye contact with Johnson.[79]

In his third claim, Johnson argues that his counsel failed to investigate the circumstances of jailhouse informant Tejeda's testimony, including an allegation by a person named Ronald Wilson ("Wilson"), who had been in jail with Tejeda.[80] Johnson submits an affidavit by Wilson stating that Tejeda informed Wilson that he was cooperating with the government in Johnson's case in an effort to obtain U.S. citizenship.[81] The government allegedly gave Tejeda a document which "contained information about" Johnson's case with instructions to memorize it before his testimony.[82] However, Wilson's affidavit states that he did not read the document

---

[79] R. Doc. No. 1753, at 275. Johnson also asks the Court to "[i]magine the impact on the jury had counsel asked: Mr. Wade, you have testified in two previous trials, at least one grand jury proceeding, and you have met with the FBI on several occasions; and yet today was the first time you have ever said that you saw Curtis Johnson pull a bag of guns up into the vehicle. Could you please explain to the jury why that is?" *See* R. Doc. No. 1851, at 10. Not only is this the sort of "tinkering" that *Strickland* cautions against, *Castillo*, 640 F. App'x at 292, but any imagined impact is also lessened by the obvious explanation that he did not mention Johnson in previous testimony because Wade's prior testimony concerned other defendants.

[80] R. Doc. No. 1843, at 34–35.

[81] R. Doc. No. 1843-2, at 2.

[82] *Id.* at 2–3.

25

and that he has no personal knowledge of its contents.[83] Wilson also states in his affidavit that he informed Johnson that he was willing to testify about what he observed, but that "no one ever came to see [him] about the matter."[84]

In his fourth argument, Johnson argues that his counsel failed to adequately investigate his alibi with respect to his whereabouts on the date and time of the Loomis armored truck robbery.[85] Johnson claims that several individuals would have verified his presence at the Orleans Parish Criminal District Court at the exact time of the robbery.[86] However, his counsel only spoke with two out of the three individuals that he provided to verify his alibi.[87]

With respect to both his third and fourth arguments, Johnson argues that his counsel failed to investigate and call certain witnesses. "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538. To prevail on an ineffective assistance of counsel claim based on an uncalled witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed

---

[83] *Id.* ("[W]hen [Tejeda] came back [from court] later that day he had a document in his hand, which *he said* contained information about a 2013 armored truck robbery/murder that the Government wanted him to memorize and testify about at the upcoming trial of a person named Curtis Johnson, . . . ." (emphasis added)).

[84] *Id.* at 3.

[85] R. Doc. No. 1843, at 36.

[86] *Id.*

[87] *Id.* at 36–37.

26

testimony, and show that the testimony would have been favorable to a particular defense." *Id.*

With respect to Johnson's argument that his counsel should have called Wilson to testify, Johnson's memorandum and Wilson's affidavit fail to establish that Wilson's testimony would have been favorable to him because they fail to state the contents of the document that was allegedly provided to Tejeda. Additionally, Johnson's counsel questioned Tejeda extensively about his immigration-related motivations for providing his testimony,[88] and even suggested that Tejeda had fabricated his testimony entirely by pointing out that the information he had provided to the government was already made public in a leaked newspaper article.[89] As for the alleged failure to investigate and call the alibi witnesses, Johnson fails to establish that these unnamed individuals were available to testify and would have agreed to do so.[90] The Court cannot conclude that the failure to investigate and call Wilson or the unnamed alibi witnesses to testify prejudiced Johnson in his case, because he has not met his burden of demonstrating that, had they been investigated

---

[88] *See, e.g.*, R. Doc. No. 1754, at 217.

[89] *Id.* at 218–19 ("A. . . . [Johnson] said that Jas was talking to the people and the people already knew that him and Jas left to Texas in a red GS Pontiac. That's what I wrote down in Spanish. Q. Right. And lots of people knew that because . . . it was in the newspaper that George fled the state in a red Pontiac G6 and that his girlfriend told him – said that, correct? . . . Q. Everybody knew this information. This wasn't new information that you had. . . . Q. And you were making this up to try to get your – fulfill your promise for asylum, weren't you?").

[90] As of the date Johnson filed his reply, he had still not located the third witness that his counsel had allegedly failed to speak to. *See* R. Doc. No. 1851, at 11.

and called, there is a reasonable probability that the result of his trial would have been different.

Lastly, with respect to the testimony of DNA analyst Brocamontes, Johnson argues that his counsel should have argued that there have been "no peer-reviewed validation studies with respect to probabilistic genotyping involving trace DNA <u>and</u> multiple contributors."[91] The Court cannot confirm the accuracy of Johnson's statement in this respect. However, even assuming its truth, the Court cannot conclude that the failure to question Brocamontes about a lack of peer reviewed studies involving both trace DNA and multiple contributors prejudiced Johnson. Brocamontes never testified that such a study existed. Indeed, unlike Dr. Perlin, who testified at Johnson's first trial, Brocamontes testified that she had verified the reliability of the True Allele software used in Johnson's case with her own validation studies, not by pointing to any peer reviewed studies.[92] Any failure to confront Brocamontes with the fact that there is a lack of peer reviewed studies would not, as Johnson contends, have had a reasonable likelihood of causing Brocamontes's testimony to be excluded or changed the outcome in this matter.

iii.    *Failure to Object to Out-of-Court Statements by Co-Defendants Lilbear George and Chuk Ofomata*

For Johnson's third argument, Johnson argues that his counsel was ineffective by failing to object to the admission of out-of-court statements by co-defendants

---

[91] R. Doc. No. 1843, at 51–52 (emphasis in original).
[92] R. Doc. No. 1753, at 225–27.

Lilbear George ("George") and Ofomata "on the grounds that they were not 'unavailable' within the meaning of Federal Rule of Evidence 804(a)." Rule 804(a) describes when a declarant is "unavailable":

> A declarant is considered to be unavailable as a witness if the declarant:
>
> (1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies;
> (2) refuses to testify about the subject matter despite a court order to do so;
> (3) testifies to not remembering the subject matter;
> (4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or
> (5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:
>     (A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or
>     (B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).
>
> But this subdivision (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying.

FED. R. EVID. 804(a). Rule 804(b) then goes on to explain what types of statement are excepted from the rule against hearsay "if the declarant is unavailable" pursuant to Rule 804(a).

Johnson raised a similar argument on appeal, arguing that this Court erred in admitting statements of George through the testimony of Hurst, because they did not qualify as statements against interest and were not supported by corroborating circumstances indicating trustworthiness as required by the hearsay exception in

29

Rule 804(b)(3).[93] *See Johnson*, 85 F.4th at 321. In affirming this Court's judgment, the Fifth Circuit concluded that the statements were admissible pursuant to Rule 804(b)(3) and that Johnson had not established that admitting these statements had a reasonable probability of changing the result of the proceedings.[94] *Id.* at 320–21.

Johnson did not argue on appeal that George was not unavailable within the meaning of Rule 804(a). *See id.* at 320 ("Johnson concedes George's unavailability."). Instead, Johnson now argues that his counsel was ineffective for failing to object to this Court's admission of the hearsay statements on the grounds that George and Ofomata were not unavailable within the meaning of Rule 804(a).[95] While Johnson argues that they would ordinarily be unavailable because the government could not compel them to testify because of their privilege against self-incrimination, he argues that this privilege was no longer applicable because both George and Ofomata were granted immunity.[96]

The Fifth Circuit has already determined on appeal that Johnson had not demonstrated that the admission of the relevant hearsay statement had a reasonable probability of changing the proceedings, because there were various other pieces of evidence that placed Johnson at the robbery.[97] Though Johnson changes his theory with respect to why these statements should not have been admitted, and asks this

---

[93] Fifth Circuit Case No. 22-30421, R. Doc. No. 48, at 19–20.
[94] R. Doc. No. 1776-1, at 8–9.
[95] R. Doc. No. 1843, at 37.
[96] *Id.* at 40–41; *see also* R. Doc. Nos. 1639, 1641.
[97] R. Doc. No. 1776-1, at 8–9.

Court to consider the prejudicial effect of "all of George and Ofomata's out-of-court statements" rather than solely the one considered by the Fifth Circuit on appeal, he has still not demonstrated that excluding these statements has a reasonable probability of affecting the outcome of the proceedings in light of the other evidence tying him to the robbery.[98] Johnson's assertion that "without those statements, it is a virtual certainty that [he] would have been acquitted" is conclusory and fails to carry his burden.[99]

### iv.    Failure to Object to Jamell Hurst's Testimony

Jonson's fourth argument states that his counsel was ineffective by failing "to object to Jamell Hurst's testimony on the grounds that he acted as a government agent and had thus solicited information in violation of each defendant's Sixth Amendment right to counsel."[100] He also seems to argue in his reply that his Fifth Amendment right to counsel attached because *Miranda v. Arizona*, 384 U.S. 436 (1966), stands for the proposition that "a suspect's right to counsel attaches just prior to custodial questioning."[101]

---

[98] For example, the testimony of jailhouse informant Gerardo Tejeda, *see* R. Doc. No. 1754, at 195–232, the bandana DNA evidence, *see* R. Doc. No. 1753, at 243, and—as noted by the Fifth Circuit—"Wade's testimony that . . . [he] saw Johnson assist Ofomata in loading into the vehicle used in the robbery." *Johnson*, 85 F.4th at 321.

[99] The Court further notes that the factual bases signed by George and Ofomata explicitly name Johnson as one of the shooters in the robbery, *see* R. Doc. Nos. 1389, 1391, although the Court does not rely upon the same in connection with the resolution of this petition.

[100] R. Doc. No. 1837, at 12.

[101] R. Doc. No. 1851, at 17.

An individual's Sixth Amendment rights have been violated when the state is allowed to use "against him at his trial evidence from his own incriminating words, which [government] agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *See Massiah v. United States*, 377 U.S. 201, 206 (1964). "A *Massiah* violation has three elements: '(1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present; and (3) that agent deliberately elicits incriminating statements from the defendant.'" *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014) (cleaned up) (quoting *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006)). The Sixth Amendment right to counsel "attaches when the defendant is indicted." *Id.*

Johnson acknowledges that his Sixth Amendment right to counsel had not attached at the time that Hurst elicited information.[102] As for any Fifth Amendment right to counsel, "the Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion." *United States v. Henry*, 447 U.S. 264, 272 (1980); *see also Illinois v. Perkins,* 496 U.S. 292, 296 (1990) ("Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*."). Neither of Johnson's theories regarding his right to counsel have merit. Counsel is not ineffective for failing to make a meritless objection. *Wood v. Quarterman*, 503 F.3d

---

[102] R. Doc. No. 1843, at 42.

408, 413 (5th Cir. 2007); *see also Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) ("Counsel is not required to make futile motions or objections."). Johnson's counsel was therefore not ineffective for declining to object to Hurst's testimony on the ground that he elicited incriminating statements from Johnson while acting as a government informant.

v.  *Failure to Object to the Admission of Hearsay*

In his fifth argument, Johnson contends that his counsel was ineffective by failing "to object to the admission of testimonial hearsay and other hearsay."[103] Johnson contends that it would be impossible "to catalog every example of the hearsay that permeated [his] trial," but he states that he will point out the most egregious examples.[104]

Federal Rule of Evidence 802 provides that "[h]earsay is not admissible except as provided by [the Federal Rules of Evidence] or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *United States v. Piper*, 912 F.3d 847, 855 (5th Cir. 2019). For the purposes of the hearsay rule, a statement is (1) an oral or written assertion or (2) "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a).

As an additional prohibition on out-of-court statements, the Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the

---

[103] R. Doc. No. 1837, at 12.
[104] R. Doc. No. 1843, at 45.

33

accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause "applies to witnesses against the accused—in other words, those who bear testimony." *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (citation and quotations omitted). "Testimony, in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *id.* (citation and quotation omitted), including "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Brown v. Epps*, 686 F.3d 281, 286–87 (5th Cir. 2012) (quoting *Crawford*, 541 U.S. at 52). The "basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

Johnson's motion first points to testimony by Marc Boudreau ("Boudreau"), a firearms examiner, indicating that he had connected three of the four identified firearms to the perpetrators based on the fact given to him that the fourth firearm, a 40-caliber pistol, belonged to the victim.[105] Johnson argues that this statement encompassed an "out-of-court testimonial statement that was provided to him at some point prior to the trial."[106] Johnson next points to Boudreau's testimony with respect to a conclusion made in a supplemental report by another firearms examiner,

---

[105] *Id.* at 46; *see also* R. Doc. No. 1753, at 64 ("So my examination was based on the facts provided to me that the 40-caliber pistol belonged to the victim.").
[106] R. Doc. No. 1843, at 46.

Sean McElrath ("McElrath"), that certain casings had been fired from the same weapon.[107] He states that this testimony was hearsay and testimonial and that he did not have an opportunity to cross-examine McElrath.[108]

Johnson cannot demonstrate prejudice for either of these statements. Other evidence supported the fact that the 40-caliber gun belonged to Trochez. Courtney Hebert of the New Orleans Police Department Crime Lab testified that the firearm was found near Trochez.[109] Boudreau likewise connected the firearm to casings that were fired toward the direction of the robbers.[110] With respect to McElrath's supplemental report, Boudreau testified only that McElrath reached the same conclusion as he did after examining two fired 223-caliber casings that were found at the scene.[111] Thus, testimony about McElrath's report presented the jury with no new conclusions that were not already supported by other testimony. Further, Johnson's counsel did object to the report itself being entered into evidence.[112] Johnson cannot show that his counsel's failure to object to this testimony would have affected the outcome of his case.

---

[107] *Id.* at 47.

[108] *Id.*

[109] R. Doc. No. 1753, at 32–34.

[110] *Id.* at 70–71.

[111] *Id.* at 68.

[112] *See id.* at 57, 68. The Court allowed the report to be admitted for demonstrative purposes only. *See id.* at 68.

Next, Johnson points to testimony of FBI agent Lisa Horner ("Horner") in which she used the word "we" when describing the collection of DNA evidence.[113] Johnson contends that he "had a right to know exactly who had allegedly collected this DNA evidence and the right to cross-examine this person."[114] The Court cannot conclude that Johnson's counsel was deficient in failing to lodge a hearsay objection to Horner speaking in the plural first person. Moreover, Johnson's argument that his counsel's failure to object prejudiced him because "[m]aybe one of those members had a history of planting evidence, and maybe that was the member who 'found' and collected the DNA evidence" is speculative and fails to meet his burden for ineffective assistance of counsel purposes.[115] This lone speculation falls short of demonstrating that there is a reasonable probability that these objections would have changed the outcome of his trial.

Johnson then states that his counsel should have objected to testimony by New Orleans Police Department forensic sketch artist Stephanie Taillon ("Taillon") regarding a description given to her by an unnamed witness.[116] He states that he had the right to cross-examine this unknown witness regarding the descriptions she allegedly gave to Taillon.[117]

---

[113] *See* R. Doc. No. 1843, at 47; *see e.g.*, R. Doc. No. 1753, at 105 ("We collected DNA evidence from the vehicle.").
[114] R. Doc. No. 1843, at 47.
[115] *See id.*
[116] *Id.* at 47–48.
[117] *Id.* at 48.

Johnson cannot show prejudice as to Taillon's testimony. The sketch did not play a substantial part in proving the identity of any of the defendants at trial. As pointed out by Johnson's counsel,[118] Taillon testified that the witness who provided details for the sketch did not actually witness the homicide at issue in this case.[119] In addition, Hurst testified that he believed that the sketch did not look like Johnson or any of the defendants and instead looked like a friend who had passed away.[120] Elmer testified that the sketch was just one data point used during the investigation and that it was ultimately used to solicit tips from the public.[121]

Furthermore, as previously stated, substantial other evidence tied Johnson to the events in question, including testimony by Wade that, on the morning of the robbery, he saw Johnson in the Chevy Tahoe used to commit the robbery.[122] The evidence also included testimony by Hurst that George recounted the events of the robbery to him, including details of Johnson's involvement.[123] This evidence was corroborated by the testimony of jailhouse informant Tejeda[124] and testimony that Johnson could not be excluded as a potential contributor, with an inclusionary match statistic, to a DNA sample found on a bandana that officers recovered from the Chevy

---

[118] R. Doc. No. 1755, at 61.
[119] R. Doc. No. 1753, 121.
[120] *Id.* at 143–44.
[121] R. Doc. No. 1754, at 16.
[122] *See* R. Doc. No. 1753, at 275.
[123] *See id.* at 144–45.
[124] R. Doc. No. 1754, at 195–232.

Tahoe.[125] Johnson therefore has not demonstrated *Strickland* prejudice with respect to his counsel's failure to object to this testimony.

Next, Johnson states that DNA analyst Stacy Williams ("Williams") testified about DNA evidence that she "did not collect, test, or draft a report about" because her coworker who did the tests and reporting was no longer employed at the crime lab.[126] Johnson argues that his counsel was deficient not only because he failed to object to this testimony, but also because, by questioning Williams regarding the report, he invited additional testimonial evidence and hearsay testimony.[127]

Williams testified that a coworker who preceded her did the testing for the first DNA test and report.[128] However, her testimony regarding this first report contained no conclusions with respect to Johnson.[129] Furthermore, Williams made it clear that she conducted the subsequent tests.[130] She also testified that she authored the report that excluded several other parties as potential DNA contributors to the bandana, but could reach no conclusions as to whether Johnson could be included or excluded

---

[125] *See* R. Doc. No. 1753, at 242–46.

[126] R. Doc. No. 1843, at 48–49. Johnson also summarily states in this section of his argument that "the same is doubly true with respect to the testimony of Jennifer Brocamontes, the DNA analyst." *Id.* at 51. Yet, Johnson fails to identify any hearsay statements made by Brocamontes, and a review of her testimony reveals that she included no statements regarding analysis or testing conducted by anyone other than herself.

[127] *Id.* at 49–50.

[128] R. Doc. No. 1753, at 194.

[129] *Id.* at 201–02 ("A. A partial DNA profile was obtained from the swab taken from the bandana. . . . Q. . . . At this point, did you have any other information regarding who that possible partial profile belonged to at this time in the analysis? A. No, I did not."); *id.* at 218 (stating that there was no CODIS hit on the bandana sample).

[130] *See id.* at 205–10.

as a potential contributor.[131] Johnson therefore cannot demonstrate that his counsel's choice not to object to Williams's testimony with respect to the first report prejudiced him.

Lastly with respect to his hearsay claims, Johnson argues that former FBI agents Elmer and Rayes "repeatedly testified about information they had received from non-testifying sources."[132] In particular, Johnson points to Elmer's testimony that certain information provided by Hurst was corroborated by information Elmer received from a confidential informant named Lee Jackson ("Jackson") and George's ex-girlfriend, Jasmine Theophile ("Theophile"), as well as Elmer's testimony regarding his interview with Thierry King ("King"), a Chase Bank employee.[133] With respect to these statements, Johnson maintains that his counsel was deficient in failing to object on the ground that the statements were inadmissible, testimonial hearsay.[134]

Review of Elmer's testimony regarding the information provided by Jackson reveals that Elmer testified only that Jackson provided him with leads and information, without revealing what that information was.[135] The only specific information that Elmer testified Jackson provided to him was that someone in the

---

[131] *Id.* at 210–11; *see also id.* at 213 ("Q. With respect to the DNA that you got off the bandana, you could make no conclusions as to Curtis Johnson?  A. I could not.").
[132] R. Doc. No. 1843, at 53.
[133] *Id.* at 53–54.
[134] *Id.* at 55.
[135] *See* R. Doc. No. 1754, at 22–25, 38.

bank may have been involved.[136] In fact, Elmer testified that Mr. Jackson did not give him any information with respect to Johnson.[137] With respect to Elmer's testimony regarding his interview with King, he testified to her out-of-court statements only with respect to her identification of "Lil Rob" as being the street name of Robert Brumfield.[138] As for Elmer's testimony regarding the corroborating information he received from Theophile, the only information he testified to was corroborated in the article that was leaked the day prior to Elmer's meeting with Hurst.[139] Any failure to object to this testimony does not raise a reasonable probability that the outcome of the proceedings might have been different. Johnson therefore fails to demonstrate prejudice.

### vi.    Failure to Object to Jury Charges

The sixth argument in Johnson's motion argues that his counsel was ineffective in failing to object to the jury charges.[140] Johnson points to the Court's reminder to the jury that it is their duty to decide whether the government has proven the defendant's guilt beyond a reasonable doubt.[141] Johnson argues that this statement erroneously presumes the defendant's guilt.[142] Johnson also argues that

---

[136] *See id.* at 61.

[137] *Id.* at 25.

[138] *See id.* at 63–64.

[139] *Id.* at 90.

[140] R. Doc. No. 1837, at 12.

[141] R. Doc. No. 1843, at 55; *see also* R. Doc. No. 1755, at 101–02 ("I remind you that it is your job to decide whether the government has proved the defendant's guilt beyond a reasonable doubt.").

[142] R. Doc. No. 1843, at 55–56.

the charges erroneously state that a conviction is a factor that the jury may consider in deciding whether to believe a witness, but that it does not necessarily destroy a witnesses credibility.[143] Johnson argues that whether a prior conviction destroys a witness's credibility is a determination solely within the discretion of the jury and that the jury charges thereby usurped the role of the jury.[144]

Johnson fails to identify any error with respect to these instructions. The Court correctly instructed the jury that it was its duty to determine whether the government had met its burden and that it could consider a witness's conviction when assessing credibility. *See* Fifth Circuit Criminal Pattern Jury instructions § 1.05 (2024) ("The government has the burden of proving the defendant guilty beyond a reasonable doubt . . . ."); *id.* § 1.12 (stating that a witness's prior conviction may be brought to a jury's attention because the jury "may wish to consider it when [deciding], as with any witness, how much of the defendant's testimony [to] believe"). It is the role of the Court to instruct the jury on the law to apply. *Id.* § 1.01 (instructing that the court's role is to provide "detailed instructions on the law at the end of the case" and advising that those instructions will control the jury's deliberations and decision). Furthermore, the Court was clear in its instructions to the jury that Johnson is "presumed by the law to be innocent."[145]

---

[143] *Id.* at 56.

[144] *Id.*

[145] *See* R. Doc. No. 1755, at 98–99 (the Court instructing the jury that "[t]he defendant begins with a clean slate and the law does not require a defendant to prove his innocence or produce any evidence at all and no inference whatsoever may be drawn from the election of a defendant not to testify").

Next, Johnson argues that the Court erred when it instructed the jury, with respect to Hobbs Act robbery, that it was not required to find that Johnson knew that "his conduct would obstruct, delay, or affect commerce or the movement of any article or commodity in commerce."[146] Johnson argues that a scienter requirement must attach to each element of the crime, including the obstruction element.[147] However the Fifth Circuit has held that "the Hobbs Act 'does not require that the defendant have specifically intended to affect interstate commerce,' or that he acted with knowledge interstate commerce would be affected." *United States v. Buck*, 847 F.3d 267, 276 (5th Cir. 2017) (quoting *United States v. Hebert*, 131 F.3d 514, 523 (5th Cir. 1997)); *see also Rehaif v. United States*, 588 U.S. 225, 230 (2019) ("Jurisdictional elements do not describe the evil Congress seeks to prevent, but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct (normally, as here, through its Commerce Clause power). Because jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct, such elements are not subject to the presumption in favor of scienter.") (internal citations omitted).

Lastly, Johnson argues that the Court erred in giving the jury an instruction that, in order to find Johnson guilty for aiding and abetting murder in violation of 18 U.S.C. § 924(j), the government had to prove that Johnson "actively participated [in the robbery] with advanced knowledge that there was a genuine risk that a person

---

[146] *Id.*
[147] *Id.* at 56–58.

might be shot and killed" during the robbery.[148] Johnson argues that this is error because an aiding and abetting conviction requires more than just an act facilitating an element of the crime, but also a state of mind extending to the entire crime.[149]

"[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Rosemond v. United States*, 572 U.S. 65, 77 (2014). This intent "must go to the specific and entire crime charged." *Id.* at 76.

The Court correctly instructed the jury in this regard in stating that, in order to find Johnson guilty for aiding and abetting murder in violation of 18 U.S.C. § 924(j), it must find that Johnson had known of the risk that a person might be shot and killed, rather than a mere general intent to aid and abet the Hobbs Act robbery. *See United States v. Gyamfi*, 357 F. Supp. 3d 355, 362 (S.D.N.Y. 2019) ("The defense rightly does not ask this Court to hold that an accomplice must intend that a person will be killed [to be held liable pursuant to § 924(j)]. Such a rule would remove any distinction between felony murder and intentional murder in the aiding-and-abetting context, a result inconsistent with the statutory design."); *see also United States v. Carbins*, 882 F.3d 557, 566 (5th Cir. 2018) ("In a § 924(c) case, such intent requires 'advance knowledge' of the firearm or 'knowledge at a time the accomplice can do something with it—most notably, opt to walk away.'"); *cf. United States v. Diaz*, 90 F.4th 335, 348 (5th Cir. 2024) (affirming the defendant's conviction pursuant to

---

[148] *Id.* at 58 (alteration in original).
[149] *Id.*

§ 924(j) where the defendant did not commit the murder himself, but rather aided and abetted his co-defendant's commission of the murder "through words of encouragement and his readiness to render aid").[150]

Because the Court concludes that Johnson's proposed objections would be meritless, Johnson's counsel was not deficient in failing to object and Johnson has not demonstrated *Strickland* prejudice.

*vii.    Failure to Move to Dismiss Count Three of the Second Superseding Indictment*

Johnson's seventh argument states that his counsel was ineffective because he "failed to move for dismissal of Count Three of the second superseding indictment," —using, carrying, brandishing, and discharging firearms during and in relation to a crime of violence, causing death, pursuant to §§ 924(c)(1)(A) and 924(j)(1)—"on the grounds that the underlying predicate offense was not a crime of violence."[151] Johnson argues that aiding and abetting Hobbs Act robbery is not categorically a crime of violence and that it therefore cannot serve as a predicate offense.[152] However, prior to Johnson's second trial, the Court rejected this argument with respect to Ofomata's motion to dismiss count three of the second superseding indictment, concluding that aiding and abetting Hobbs Act robbery is a crime of violence for purposes of

---

[150] *See* R. Doc. No. 1753, at 145 ("[George] was like I don't know who killed him, me or Chuk, but both of us was shooting. One of us must have shot the person, too, and he said that's when [Johnson] jumped out and started shooting at the truck, so the person in the truck wouldn't get out and try to help.").

[151] R. Doc. No. 1837, at 12.

[152] R. Doc. No. 1843, at 59.

§ 924(c)(3)(A).[153] Moreover, the Fifth Circuit has since explicitly rejected Johnson's argument. *See United States v. Hill*, 63 F.4th 335, 363 (5th Cir. 2023) ("Our precedent is consistent with th[e] understanding of aiding and abetting law, and, like our sister circuits, we conclude that the substantive equivalence of aiding and abetting liability with principal liability means that aiding and abetting Hobbs Act robbery is, like Hobbs Act robbery itself, a crime of violence."). Counsel was not deficient for declining to raise a meritless argument that the Court had already rejected with respect to Johnson's co-defendant.

### viii.    Failure to Object to Prosecutorial Misconduct

In Johnson's eighth argument, he argues that his trial counsel was ineffective "when he failed to object to the prosecutor's pervasive misconduct."[154] As one example, Johnson reiterates his *Brady* allegations regarding the five categories of evidence against Hurst.[155] As described above, the government did not suppress this evidence within the meaning of *Brady*.[156] Therefore, Johnson's counsel was not deficient in failing to object to this evidence being "suppressed." *See Williamson*, 183 F.3d at 462 ("Counsel does not need to raise every nonfrivolous ground of appeal available." (internal quotations omitted)).

Johnson also realleges, as described above, that the prosecution induced Tejeda to commit perjury by giving him a document relevant to Johnson's case and

---

[153] *See* R. Doc. No. 1047.
[154] R. Doc. No. 1837, at 12.
[155] R. Doc. No. 1843, at 60.
[156] *See supra* section III(a).

instructing Tejeda to memorize it in preparation for his testimony.[157] However, as described above, by failing to set forth the contents of the documents that Tejeda was allegedly told to memorize, Johnson fails to establish any misconduct on the part of the prosecution.

In his next example, Johnson states that the prosecution committed misconduct by vouching for the credibility of their informant witnesses, though he provides no examples of such statements.[158] In habeas proceedings, a prosecutor's remarks "do not present a claim of constitutional significance unless they were so prejudicial that [the trial] was rendered fundamentally unfair within the meaning of the fourteenth amendment." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985). "There is such unfairness only if the prosecutor's remarks evince 'either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Id.* (quoting *Fulford v. Maggio*, 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds*, 462 U.S. 111 (1983)). Having reviewed the transcript of Johnson's trial, Johnson has not provided a basis from which the Court can conclude that any alleged arguments in favor of the credibility of the government's witnesses rendered the trial fundamentally unfair in this way, or that Johnson's counsel was ineffective for failing to object to the same. Furthermore, Johnson has made no effort, and therefore fails,

---

[157] R. Doc. No. 1843, at 60.
[158] *Id.*

to demonstrate *Strickland* prejudice with respect to the alleged prosecutorial misconduct.[159]

Johnson further alleges that the prosecution "grossly misstated the evidence" during closing arguments.[160] In particular, Johnson points to the prosecutor's misquote of Wade's testimony. Wade testified that after he called Johnson to warn him about the FBI, Johnson told him "I don't know what you talking about" and then hung up the phone.[161] Instead, the prosecutor quoted Wade as stating, "I do know what you're talking about. I'm not talking to you on the phone."[162] Considering the substantial evidence presented during trial as discussed throughout this order and reasons, the Court cannot conclude that this misstatement rendered the trial fundamentally unfair or prejudiced the outcome of Johnson's case.

In another instance, Johnson argues that the prosecutor misstated the DNA evidence and committed the prosecutor's fallacy by equating the random match probability of a partial DNA sample with the probability that the defendant was not the sample's source.[163] Johnson made this same argument on direct appeal.[164] The

---

[159] The Court notes that the jury was instructed that "[t]he questions, statements, objections, and arguments made by the lawyers are not evidence" and that it must only consider the evidence in rendering its verdict. *See* R. Doc. No. 1755, at 99.

[160] R. Doc. No. 1843, at 61.

[161] *Id.*; *see also* R. Doc. No. 1753, at 303 (testimony by Wade that Johnson said, "I don't know what you talking about" and then hung up the phone).

[162] R. Doc. No. 1843, at 61; *see also* R. Doc. No. 1755, at 49 (the government's closing statements in which the prosecutor stated that Johnson told Wade "I do know what you're talking about. I'm not talking to you on the phone").

[163] *Id.* at 61.

[164] *See* R. Doc. No. 1776-1, at 2–5.

Fifth Circuit rejected the argument that misstatements of statistics in the government's closing argument cast doubt on the correctness of the jury's verdict.[165] Specifically, the court noted that the statistic was correctly stated numerous times by the prosecution, defense counsel, and the expert witness.[166] The Fifth Circuit also rejected Johnson's assertion that his substantial rights were affected, noting that there was substantial other evidence tying Johnson to the vehicle used in the robbery.[167] Accordingly, Johnson has failed to establish that any alleged deficiency by his counsel prejudiced his case.

Lastly, Johnson argues that the government failed to disclose that the FBI's Cellular Analysis Survey Team used AT&T's "notoriously unreliable" Network Event Location System data in its historical cell-site analysis.[168] Johnson states that this information could have been used to cross-examine FBI Agent James Berni during his testimony regarding the historical cell site data and that the jury could have found the data to be unreliable.[169] Considering the fact that this evidence "corroborate[d] the testimony" of Cedric Wade, Johnson argues that had his counsel shown that the cell-site data was unreliable, this would have further led the jury to be "reluctant to rely on Cedric Wade's uncorroborated testimony."[170] Johnson states that he is unsure

---

[165] *Id.* at 4–5.
[166] *Id.* at 4.
[167] *Id.* at 5.
[168] R. Doc. No. 1843, at 62.
[169] *Id.* at 62–63.
[170] *Id.* at 63.

whether his counsel was made aware of this data.[171] He argues that if his counsel was not provided with the data there was a *Brady* violation warranting a new trial, but that if his counsel did have the data, he was ineffective for failing to use that evidence to impeach Berni.[172]

With respect to this argument, Johnson offers no facts or evidence other than his speculative and conclusory allegation that the jury may have found the AT&T data to be unreliable, and that this, in turn, would have made the jury reluctant to rely on Cedric Wade's testimony. The Court has no idea whether or to what extent the government relied on such data and defendant has produced no evidence to support his claim. Johnson's conclusory assertion is insufficient to raise a constitutional issue or to meet his burden of showing that there was a reasonable probability that the result might have been different if his counsel had raised this argument. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.").

### ix.    Failure to Raise These Issues on Appeal

Lastly, Johnson argues that his appellate counsel was ineffective by failing to raise the abovementioned issues and other meritorious issues on appeal.[173] As an

---

[171] *Id.* at 62.
[172] *Id.* at 63.
[173] R. Doc. No. 1837, at 12.

example of another "meritorious" issue, Johnson argues that his counsel should have raised the adverse ruling on Johnson's motion to exclude DNA evidence.[174]

Appellate "[c]ounsel is not deficient for not raising every non-frivolous issue on appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). Reasonableness under *Strickland* merely requires "counsel to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Id.* (quoting *Williamson*, 183 F.3d at 462–63). To satisfy the *Strickland* standard, appellate counsel need not raise arguments on appeal that will not prove meritorious. *See id.* ("[T]o determine whether [the defendant's] appellate counsel was deficient, we consider whether [the] challenge . . . would have been sufficiently meritorious such that [his] counsel should have raised it on appeal."). In addition, in order to demonstrate prejudice, a defendant must "show a reasonable probability that, but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal." *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001) (citations omitted).

As to each of Johnson's arguments above, the Court has concluded that Johnson's counsel was either not deficient because the arguments would not have been meritorious or that Johnson has failed to establish that any alleged deficiencies prejudiced Johnson's case. Johnson's counsel was therefore not deficient in failing to raise issues on appeal when they were either unlikely to be successful or there was no reasonable likelihood that it would change the outcome of Johnson's case.

---

[174] R. Doc. No. 1843, at 64.

As for Johnson's argument regarding the Court's adverse ruling with respect to DNA evidence, the ruling Johnson cites was made during Johnson's first trial.[175] Johnson points to no adverse ruling with respect to DNA evidence made during his retrial that appellate counsel could have raised on appeal. *United States v. Palmer*, 122 F.3d 215, 221 (5th Cir. 1997) ("A retrial . . . is both in purpose and effect a new trial. Accordingly, objections made at the aborted trial have no bearing on the retrial, as the two are entirely separate affairs. . . . Although formal, written motions such as severance motions may have more of a lasting effect than simple objections, our previous analysis of the law-of-the-case doctrine indicates that district courts are not always bound by their prior rulings on pretrial motions."). Furthermore, trial counsel was not constitutionally unreasonable for failing to re-urge the motion to exclude, considering it had been denied during Johnson's first trial. *Cf. Linicomn v. Dir.*, No. 6-440, 2008 WL 112111, at *5 (E.D. Tex. Jan. 7, 2008), *aff'd sub nom. Linicomn v. Thaler*, 358 F. App'x 549 (5th Cir. 2009).

Accordingly, the Court cannot conclude that Johnson's appellate counsel provided constitutionally ineffective assistance. Because the "motion and the files and records of the case conclusively show" that Johnson "is entitled to no relief," the Court will not hold an evidentiary hearing. *See* 28 U.S.C. § 2255(b).

---

[175] *See* R. Doc. No. 1243.

## IV.     CONCLUSION

Accordingly,

**IT IS ORDERED** that defendant's motion for new trial is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that defendant's motion to vacate, set aside or correct his sentence is **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, October 6, 2025.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**